NOTICE
Decision filed 11/06/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240429-U

NO. 5-24-0429

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Franklin County. |
| | ) | |
| v. | ) | No. 23-CM-166 |
| | ) | |
| ROBERT E. MORRISON, | ) | Honorable |
| | ) | Thomas J. Tedeschi, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The evidence was sufficient to prove the defendant guilty of resisting or obstructing a peace officer. The evidence was insufficient to prove the defendant guilty of obstructing service of process. Therefore, the judgment is affirmed in part and reversed in part.

¶ 2    Following a jury trial, the defendant, Robert E. Morrison, was convicted of one count of resisting or obstructing a peace officer and one count of obstructing service of process. The defendant was sentenced to 90 days in Franklin County jail. On appeal the defendant claims that there was insufficient evidence to find the defendant guilty of both charges.

¶ 3                                I. BACKGROUND

¶ 4    On May 24, 2023, Paul Uraski, a deputy employed by the Franklin County Sheriff's Office, went to the defendant's home in Benton, Illinois, to serve him with two "no-stalking" protective orders. When Uraski knocked on the door, it was answered by the defendant's fiancé, now

1

husband, Nathan Gleghorn. Uraski informed Gleghorn that he had papers for the defendant. Gleghorn indicated he would let the defendant know. When the defendant came to the door, he and Uraski had words, which led to an arrest, resulting in the charges against the defendant.

¶ 5    On June 1, 2023, the State charged the defendant by information with one count of resisting a peace officer (count I). The State alleged that the defendant "knowingly resisted the performance of Deputy Paul Uraski of an authorized act within his official capacity, being his arrest, knowing Deputy Paul Uraski to be a peace officer engaged in the execution of his official duties, in that the defendant pulled away, laid on the floor, and refused to be handcuffed," in violation of section 31-1(a) of the Criminal Code of 2012 (720 ILCS 5/31-1(a) (West 2022)). The State also charged the defendant by information with one count of obstructing service of process (count II). In count II, the State alleged that the defendant "knowingly resisted the authorized service of two Orders of Protection, being 23-OP-191 and 23-OP-192 from the 2nd Judicial Circuit, in that Robert Morrison screamed and cursed and refused to listed [*sic*] and speak with Deputy Paul Uraski, while walking away after being told several time [*sic*] to not walk away or shut the door on his mobile home, knowing Deputy Paul Uraski was there to serve him with the Orders of Protection, while Deputy Paul Uraski was engaged in the execution of his Official Duties" in violation of section 31-3 of the Criminal Code of 2012 (720 ILCS 5/31-3 (West 2022)).

¶ 6    On January 9, 2024, a jury trial was held. At trial, Deputy Uraski was called as the State's first witness. Uraski gave an account of the events that took place on May 24, 2023. While on duty, Uraski went to the defendant's house to serve him with two "no stalking" orders. When the defendant came to the door, he began to scream and curse. Uraski said that the defendant "just wasn't having any part of it." The defendant tried to shut the door on Uraski and Uraski put out his hand to stop the door. The defendant tried to shut the door on Uraski again. Uraski pushed

2

himself through the door into the defendant's mobile home. Uraski told the defendant that he was going to be placed under arrest for obstructing. The defendant positioned himself over the arm of a couch with his hands tucked towards his chest. When Uraski went to handcuff the defendant, the defendant pulled his arm away from Uraski, resulting in a brief 20 to 30 second struggle. After placing the defendant in handcuffs, Uraski called for assistance. As a result of the struggle, the defendant was lying on the floor and refused to get up. Uraski needed help escorting the defendant to the patrol vehicle. The defendant was also claiming that he was handicapped and disabled. Uraski thought that it would be best to not do anything else and wait for assistance. Uraski testified that he let "someone else" escort the defendant to the patrol vehicle, so that the situation would not escalate any further. During the time Uraski was waiting for backup, the defendant was not fighting or resisting. The defendant was "mumbling, carrying on a little bit."

¶ 7    On cross-examination Uraski testified that Gleghorn had originally answered the door. Uraski explained that he could not leave the protective orders with Gleghorn because Uraski had to personally serve the defendant. Uraski was asked if he could have just left the orders of protection with the defendant and told him, "You are served." Uraski stated that he needed to "explain things in the order of protection" to the defendant. When Uraski was asked if he was required by law to serve orders of protection in that way, Uraski responded that it was the way he was taught. Uraski was asked additional questions regarding the arrest. Uraski testified that the defendant had started to walk away while Uraski was explaining the orders of protection. Uraski then instructed the defendant not to turn away from him. When the defendant continued to walk away, Uraski placed him under arrest. After the defendant was placed in handcuffs, he was lying on the ground and refused to get up. Uraski was asked whether the defendant had a cigarette in his

3

hand that interfered with handcuffing the defendant. Uraski stated that he did not remember the defendant having a cigarette during the altercation, but it was possible.

¶ 8    Sarah Parke, a sergeant with the West City Police Department, was the State's next witness. Parke testified that she was on patrol on May 24, 2023. While on patrol she received a call requesting assistance. When Parke arrived at the scene, she saw that Uraski had the defendant in handcuffs, and that they were preparing to come outside. Parke was one of the officers that helped escort the defendant to Uraski's patrol vehicle. Parke recalled that the defendant was not complying, and that he was "yelling, and he was dragging his feet, putting his feet underneath him so he didn't have to walk down the stairs." On cross-examination, Parke acknowledged that the defendant told her that he had a physical disability. Parke further acknowledged that it was possible that the defendant could have had trouble walking and was not actually resisting.

¶ 9    At the conclusion of Parke's testimony, the State rested. The defense then moved for a directed verdict outside of the jury's presence. After hearing arguments from the State and defense counsel, the court denied the motion.

¶ 10    The defendant called Nathan Gleghorn as his first witness. Gleghorn recounted the interaction between the defendant and Uraksi on May 24, 2023. Gleghorn recalled that he initially answered the door and encountered Deputy Uraski. Uraski advised that he had orders of protection for the defendant that were related to stalking. The defendant then came to the door. At that point, Uraski indicated he had papers to serve on the defendant. Uraski began reading from them. As he was attempting to read from the paperwork, Uraski was informed by the defendant that he needed to sit down. Gleghorn explained that the defendant started to lose his balance because he had metal plates in his feet and legs. Gleghorn also stated that the defendant had "a couple of cysts on his bottom." Uraksi told the defendant to sit on a bar stool, but the defendant said that he could not sit

4

on the barstool "because it hurt his bottom due to the cysts." The defendant went to sit on the couch that was approximately one foot to three feet away from where the barstool was located. At that point, Uraski "went after him, pulling him down like a rag doll off the couch." Gleghorn testified that the defendant was smoking a cigarette and that Uraski burned the defendant's arm when he was trying to place handcuffs on the defendant. Gleghorn yelled at Uraski and the defendant to stop fighting. After the arrest, Gleghorn also indicated that the defendant did not pull away from the officers as they escorted the defendant to the patrol car. On cross-examination, Gleghorn said that he had to remove the cigarette from the defendant's hand after the defendant's arm was burnt. Gleghorn also stood on the front porch, and he watched the defendant when he was escorted to the patrol car.

¶ 11     The defendant testified on his own behalf. He recounted the events leading to his arrest. The defendant stated that after Uraski finished reading the first order of protection, he told Uraski that he needed to sit down because he was going to fall. The defendant walked over to the recliner to sit down. Uraski then grabbed the defendant and tried to put handcuffs on him, which resulted in the defendant getting burned by his cigarette. The defendant testified that he was "only resisting to get that cigarette to stop burning." The defendant stated that he could not walk or hold his balance without a cane. He also denied pulling away from anybody. At the conclusion of the defendant's testimony, the defense rested.

¶ 12     Following closing arguments from the State and defense counsel, the case was given to the jury. The jury deliberated and returned a guilty verdict on both counts. At sentencing, defense counsel asked for time served, a fine, and conditional discharge. The State asked for 5 days in the county jail for each count to run concurrently, 24 months of conditional discharge, and fines that the court would deem appropriate. After considering the evidence in mitigation and factors in

5

aggravation, the court sentenced the defendant to a fine of $75 plus assessments, and 90 days in the county jail. This appeal followed.

¶ 13                                    II. ANALYSIS

¶ 14    On appeal, the defendant claims that the State failed to present sufficient evidence to prove beyond a reasonable doubt that the defendant committed the offense of obstructing service of process and the offense of resisting or obstructing a peace officer. In response, the State claims that the evidence was sufficient to prove that the defendant was guilty of both counts beyond a reasonable doubt.

¶ 15    When reviewing a claim that the State's evidence was insufficient to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Under this standard, the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *People v. Ross*, 229 Ill. 2d 255, 272 (2008). However, "merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision." *Ross*, 229 Ill. 2d at 272. A conviction will be reversed where the evidence is "so unreasonable, improbable, or unsatisfactory" that there remains a reasonable doubt about the defendant's guilt. *Ross*, 229 Ill. 2d at 272.

¶ 16                        A. Obstruction of Service of Process

¶ 17    In the case at bar, the defendant initially claims that the evidence was not sufficient to find that the defendant obstructed service of process. The defendant argues that there was no evidence

to establish that Uraski ever tried to hand the defendant the protective orders and no evidence to establish that the defendant prevented him from doing so. The defendant further argues that under Illinois law, service of process does not require orders to be read aloud to the party that is being served. Thus, the defendant concludes that he did not interfere with service of process.

¶ 18    Generally, "service of summons upon an individual defendant shall be made (1) by leaving a copy of the summons with the defendant personally, [or] (2) by leaving a copy at the defendant's usual place of abode, with some person of the family or a person residing there, of the age of 13 years or upwards." 735 ILCS 5/2-203(a) (West 2022). For a "no contact stalking order" service of process requires "the petitioner has made all reasonable efforts to accomplish actual service of process personally upon the respondent." 740 ILCS 21/60(c) (West 2020). Under Illinois law obstructing service of process occurs when someone "knowingly resists or obstructs the authorized service or execution of any civil or criminal process or order of any court." 720 ILCS 5/31-3 (West 2022). Obstruct means "to be or come in the way of." (Internal quotation marks omitted.) *People v. Raby*, 40 Ill. 2d 392, 399 (1968). "Given a reasonable and natural construction, these terms do not proscribe mere argument with a policeman about the validity of an arrest or other police action, but proscribe only some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent or delay the performance of the officer's duties." *Raby*, 40 Ill. 2d at 399.

¶ 19    As stated previously, when evaluating the sufficiency of the evidence, in the light most favorable to the prosecution, this court must determine if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson*, 443 U.S. at 319. While this court will not retry the defendant, on review this court may determine the reasonableness of the trier of fact's decision based on the evidence. *Ross*, 229 Ill. 2d at 272.

¶ 20   In this case, the evidence shows that Uraksi went to the defendant's home to serve two "no stalking" orders of protection. Uraski testified that he tried to read and explain the "no stalking" orders to the defendant, and that the defendant got upset and "wasn't having any of it." Under Illinois law, however, there is no requirement that orders of protection be read aloud to a defendant. Here, Uraski could have handed the orders of protection to the defendant. The evidence indicates that Uraski never attempted to hand the papers to the defendant. While Uraski may have been trained to explain the contents of an order of protection before serving it, the law does not require it. Thus, the defendant's refusal to listen to the explanation by Uraski does not rise to the level of obstructing service of process. The State argues that the defendant tried shutting the door in the face of Uraski which along with the *whole* conduct by the defendant rises to the level of obstruction. However, the evidence indicates that Uraski chose to attempt an explanation of the order's contents at the outset of the interaction between himself and the defendant. Thus, the defendant's subsequent conduct regarding the service of process of the "no stalking" orders did not interfere with Uraski's official duties. Therefore, we find that the evidence was insufficient to support the defendant's conviction for obstruction of service of process. Therefore, the defendant's conviction for obstruction of service of process must be reversed.

¶ 21                          B. Obstruction of a Peace Officer

¶ 22   The defendant claims that the State failed to prove the defendant guilty of resisting or obstructing a peace officer because the arresting officer admitted that it was possible that the defendant was being burned by a cigarette on his arm when he was being handcuffed. The defendant also claims that the officer escorting him to the patrol vehicle admitted that the defendant may not have been resisting but instead had trouble walking. Essentially, the defendant challenges the sufficiency of the evidence to support his conviction for resisting or obstructing a peace officer.

8

The defendant claims that the State's evidence was equivocal, and thus there was insufficient evidence to support the defendant's guilty conviction.

¶ 23    Under Illinois law, obstruction of a peace officer occurs when "[a] person *** knowingly: (1) resists arrest, or (2) obstructs the performance by one known to the person to be a peace officer, firefighter, or correctional institution employee of any authorized act within his or her official capacity." 720 ILCS 5/31-1(a) (West 2022). Obstruct means "to be or come in the way of." (Internal quotation marks omitted.) *Raby*, 40 Ill. 2d at 399. "Given a reasonable and natural construction, these terms do not proscribe mere argument with a policeman about the validity of an arrest or other police action, but proscribe only some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent or delay the performance of the officer's duties." *Raby*, 40 Ill. 2d at 399. This court must determine if upon viewing the evidence in a light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson*, 443 U.S. at 319. Again, the reviewing court will not retry the defendant, but it will determine the reasonableness of the trier of fact's decision based on the evidence presented. See *Ross*, 229 Ill. 2d at 272.

¶ 24    In this case, the evidence presented at trial shows that when Uraski attempted to handcuff the defendant, he pulled away. Uraski testified that the defendant laid on the couch and refused to allow Uraski to place handcuffs on him. There was also evidence that following the defendant's arrest, the defendant refused to get up from the floor and then dragged his feet and needed to be carried to the patrol vehicle. The defendant and Gleghorn testified as to possible explanations for the defendant's behavior. These explanations included a cigarette that was burning the defendant's arm when he was being handcuffed and that the defendant's physical disability prevented him from walking normally to the patrol car. The defendant's claim that the State's evidence was equivocal

9

was a question for the jury. The jury had the opportunity to listen to all of the testimony and judge the credibility of the witnesses. The jury ultimately found that the defendant was guilty of obstruction of a peace officer. Taking the evidence in the light most favorable to the State, we find there was sufficient evidence to support the defendant's conviction of resisting or obstructing a peace officer, and the conviction is affirmed.

¶ 25                                      III. CONCLUSION

¶ 26    For the foregoing reasons, the defendant's conviction for obstruction of a peace officer is affirmed, and the defendant's conviction for obstruction of service of process is reversed.

¶ 27    Affirmed in part and reversed in part.